490 F.2d 1234
 EAST HAMPTON DEWITT CORPORATION and General Accident Fire &
Life Assurance Corporation, Plaintiffs-Appellants,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY a/k/a State
Farm Insurance Companies, Defendant-Appellee-Appellant.
WARNER NATIONAL, INC., and Utica Mutual Insurance Company,
Plaintiffs-Appellees,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY a/k/a State
Farm Insurance Companies, Defendant-Appellant.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant
and Third-Party Plaintiff-Appellant,
v.
Maurice L. ROSEN et al., Third-Party Defendants-Appellees.
STATE FARM INSURANCE COMPANY, Defendant and Third-Party
Plaintiff-Appellant,
v.
EAST HAMPTON DEWITT CORPORATION et al., Third-Party
Defendants-Appellees.
 Nos. 70-74, Dockets 73-1202, 73-1203, 73-1438, 73-1439, 73-1593.
 United States Court of Appeals, Second Circuit.
 Argued Nov. 9, 1973.
Decided Dec. 28, 1973.
 
 William S. Andrews, Syracuse, N.Y. (Bogart & Andrews, Syracuse, N.Y. of counsel), for plaintiffs-appellants.
 John C. Setright, Syracuse, N.Y. (Jerrold P. O'Brien, and Oot, Greene, Setright, Hershdorfer & Sharpe, Syracuse, N.Y., of counsel), for defendant-appellee-appellant.
 Before WATERMAN, FRIENDLY and TIMBERS, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 We owe these appeals, raising difficult issues of New York tort law for which no precise New York precedents have been cited, to the circumstance that defendant State Farm Insurance Companies (State Farm) is an Illinois corporation having its principal place of business in that state, whereas the plaintiffs East Hampton Dewitt Corporation (East Hampton) and Warner National, Inc. (Warner) are New York corporations with their principal offices in Syracuse. The trial alone consumed 16 days of the time of this undermanned district court, heavily pressed with state prisoner petitions under 28 U.S.C. 1343(3) and 2254. There was, of course, never the slightest reason to think that these Syracuse-based plaintiffs could not have obtained full justice from the Supreme Court of New York for Onondaga County and on appeal to the Appellate Division and, if need be, to the New York Court of Appeals, respected appellate tribunals with a knowledge of and authority to declare New York law beyond anything that we possess. However, the case is here, and we must deal with it as best we can.
 
 I.
 
 2
 East Hampton is the owner and managing agent of the Romax Office Building in Syracuse, which was erected in 1956 and 1957 by Rosen-Klein Construction, Inc. Maurice Rosen was president of both companies and, although plaintiffs now slightly dispute this, admitted to having had general supervision of the construction. In 1968 East Hampton leased a suite on the third floor of the building to State Farm.
 
 
 3
 In the morning of February 27, 1969, a fire started in a small interior room, known as the 'recorder room,' of State Farm's suite. At the start it was not regarded as serious, and State Farm employees tried to fight it by filling wastebaskets with water and then by means of fire extinguishers. By 11 A.M. smoke was coming out one of the corridor doors of the main office, into which the recorder room opened. No alarm was given until 11:18 A.M., at least 18 minutes after the fire was discovered. When the engines promptly arrived, the firemen found smoke pushing from the outside windows of State Farm's office; flames were mixed in with the smoke within the recorder room and at the door of that room, and possibly to some extent in the main office as well. Ultimately the fire spread throughout the third and fourth floors, on the latter of which Warner's office was located, and there was water and other damage elsewhere. It is not disputed that total damage to East Hampton alone, including loss of rentals during repairs, was in the general range of $820,000.
 
 
 4
 Actions were brought against State Farm by East Hampton and Warner, each joined by its partially subrogated insurer. The claim was that State Farm had been negligent both in allowing the fire to start and in failing to turn in an alarm earlier, which, as plaintiff contended, would have permitted the fire to be contained in State Farm's own suite. State Farm denied negligence and took the positions (1) that it was insulated from any liability to East Hampton by a clause in its lease, and (2) that the spread of the fire was due to faulty construction of the building; it claimed that but for such construction the fire, even after the delay in reporting it, would not have spread beyond the recorder room and certainly would not have extended so far as it did.
 
 
 5
 The two actions were tried together. which was a good idea, and the trial was bifurcated, which in this case may not have been. In theory the first trial was to be on liability and the second on damages. However, the first trial could more accurately be described as having been on State Farm's negligence and the causal relation of this, standing alone, to 'the spread of the fire.' For that reason the judge, over State Farm's objection, refused to allow the introduction of evidence of faulty construction at that time; he had previously dismissed as insufficient in law State Farm's defense based on the language of its lease. He submitted to the jury the two theories of State Farm's negligence and the issue of proximate causation. The jury found for State Farm with respect to negligence in allowing the fire to start, and against it on negligence in delayinig the alarm and on the proximate causation of the 'spread of the fire' by this. With two exceptions, see note 1 infra, which@ have not been seriously pressed, State Farm has not contested these findings, although it continues to insist, with its eye on a possible new trial, that the question of how the fire 'spread' in any actionable sense could not legitimately be submitted until the evidence on contributory negligence was in. In the second phase of the trial the judge, this time over East Hampton's objection, admitted evidence of faulty construction of the building on the theory that the jury could properly take this into account by way of 'mitigation' of damages. The jury returned a verdict in favor of Warner in the sum of $25,000, very nearly the sum demanded and about whose amount no one complains, and in favor of East Hampton in the sum of $120,000, a figure whose derivation is inscrutable.
 
 
 6
 In simplified form the positions on appeal are about as follows: East Hampton claims that it is entitled to damages of $820,000 or thereabouts; that we should order the district court to enter such a judgment in its favor notwithstanding the verdict; or failing this, that there should be a new trial solely on the issue of damages from which considerations of any negligence in construction should be excluded. State Farm is willing to have us leave things as they are, indeed urges us to do so, except that it would like some way to make East Hampton contribute to the payment to Warner. However, if East Hampton wants to fight, State Farm will join in the fray. It says that judgment for $820,000 notwithstanding the verdict cannot possibly be awarded since the jury's finding of liability on the part of State Farm was made in the absence of the evidence on faulty construction. It says further and for similar reasons that if we yield to East Hampton's demand for a new trial, such a trial must cover both liability and damages, with evidence of negligent construction to be admitted in the liability phase. Alternatively, and still only if we are favorably impressed with East Hampton's claims, State Farm urges us to reverse Judge Port's dismissal of its defense based on the language of its lease.[1] In view of our disposition of East Hampton's claims, we shall not have to reach any of these issues. There are also some peripheral questions about the court's denying two applications of State Farm to serve a third party complaint under F.R.Civ.P. 14; we will deal with these in the final section of this opinion.
 
 II.
 
 7
 East Hampton devotes some effort to a semantic battle. It says in effect that the second phase of the trial was to be devoted solely to damages, and it was improper for the judge to allow, on a theory of 'mitigation,' the introduction of evidence of conditions that had long existed, about which East Hampton could do nothing after the fire started, and which are not claimed to have diminished the value of the building. We may grant the correctness of this as an abstract proposition, without accepting the conclusion East Hampton would have us draw from it. As already noted, despite confusing verbiage about 'liability' and 'damages', what the judge did in effect was to deal in the first phase of the trial solely with State Farm's negligence and its causal relation to 'the spread of the fire,' reserving the claim of faulty construction for the second phase. If the jury had found no negligence by State Farm, or lack of proximate cause of the spread of the fire from State Farm's negligence, that would have ended the case; if it found negligence and initial causation, the trial could go on to the second phase where all other issues would be considered. No contention is or could be made that admission of evidence of faulty construction occasioned unfair surprise. If, as a matter of law, there was an issue in regard to East Hampton's contributory negligence and this was properly put to the jury in the second phase of the trial, we will not reverse simply because of a misnomer.
 
 
 8
 A contention of East Hampton requiring much more consideration is that the concept of contributory negligence simply had no place in a case like this. Here East Hampton relies on three lines of New York decisions-- cases holding that where a railroad engine starts a fire on plaintiff's premises, it is of no consequence that the plaintiff had inflammable material near the tracks; personal injury cases holding that a defendant takes the plaintiff 'as he finds him' and cannot avoid or reduce liability because an ordinary plaintiff would not have been injured or injured so much; and cases upholding the insulating effect of an 'intervening cause'.
 
 
 9
 Before discussing these cases, it will be useful to state what our view would be if New York precedents do not compel us to take a different one. We have here a rather special problem in the area of contributory negligence; in fact in might be better to phrase the question in terms of a plaintiff's right to recover for consequences which would not have occurred but for his fault. It is common ground that a plaintiff cannot recover for such consequences if the fault occurs after the accident. Here, for example, if the fire had started at night as a result of a State Farm employee's having negligently left a burning cigarette in a wastebasket and a watchman employed by East Hampton had seen the fire but failed to turn in an alarm, it is plain that plaintiff could not recover for damages that a prompt alarm would have prevented. 2 Harper & James, Torts 22.10 at 1231-32 (1956); Restatement of Torts 2d 918(1) (Tent. Draft No. 19, 1973). This principle has been long accepted in New York. Indeed, one of the classic formulations is Chief Judge Hiscock's statement in Den Norske Ameriekalinje Actiesselskabet v. Sun Printing & Publishing Ass'n, 226 N.Y. 1, 7, 122 N.E. 463, 465 (1919):
 
 
 10
 The rule is of general and widespread application that one who has been injured either in his person or his property by the wrongful act or default of another is under an obligatory duty to make a reasonable effort to minimize the damages liable to result from such injury, and that if he does not make such reasonable effort he will be debarred from recovering for those additional damages which result from such failure.
 
 
 11
 The social policy behind this is evident. Whatever considerations justify imposition of liability for harm negligently caused by a defendant, these do not extend to damages the plaintiff could reasonably have avoided. A rule denying compensation for such damages supposedly promotes careful conduct by plaintiffs just as the imposition of liability for consequences unavoidable by plaintiffs supposedly promotes such conduct by defendants. From the standpoint of risk sharing, plaintiffs, at least in a situation such as that hypothesized, can insure against loss from their own negligence as well as can defendants.
 
 
 12
 We see no reason why the same polity considerations should not apply, at least as a general matter, where the plaintiff's failure to take reasonable precautions against the aggravation of negligent damage fairly to be anticipated occurs before the defendant's negligent act, although a variant of the last clear chance doctrine may then rescue plaintiff in a proper case, and the standard of what constitutes reasonable action by plaintiff may be more difficult to apply and the apportionment of the total damage between that which such action would and would not have avoided may be harder to effectuate. The principle that no social end is served by mulcting a defendant for damage a plaintiff could reasonably have prevented is equally applicable. Although admittedly with some restriction where evidence on which to base apportionment is lacking, on which see Section IV infra, this is the view of the Restatement of Torts 2d 465 at 511 and Illustration 1, and of the leading texts. 2 Harper & James, Torts, supra, 22.10 at 1233-34; Prosser, Torts 65 at 423-24 (4th ed. 1971). Against this stands the much debated decision, heavily relied on by East Hampton, in Mahoney v. Beatman, 110 Conn. 184, 147 A. 762 (1929), that the excessive speed at which a plaintiff was driving should not be taken into account although this greatly aggravated the damage, and the later consistent decisions in Guile v. Greenberg, 192 Minn. 548, 257 N.W. 649, 650-651 (1934), and Hamilton v. Boyd, 218 Iowa 885, 256 N.W. 290, 291-292 (1934). However, other state cases had earlier reached contrary conclusions, see Wright v. Illinois & Miss. Tel. Co., 20 Iowa 195, 214-215 (1866), and O'Keefe v. Kansas City Western Ry., 87 Kan. 322, 124 P. 416 (1912), and still other decisions, involving a plaintiff's failure to have his seat belt fastened, are inconsistent with Mahoney. See Barry v. Coca Cola Co., 99 N.J.Super. 270, 239 A.2d 273 (1967) (but refusing to allow speculative apportionment between unavoidable and avoidable damage), and other cases cited in Prosser, supra, at 424 n. 75. Justice Maltbie's dissent in Mahoney appears much more sensible to us than the majority opinion, which is heavily larded with the opaque adjectives about causation characteristic of the time. Two eminent Connecticut scholars have described Mahoney as 'quite inconsistent with the other Connecticut cases and the reasoning which generally prevails in this country today,' 2 Harper & James, Torts, supra, 22.10 at 1233. Finally, the restatement of Torts 2d 465 Illustration 1, supra, takes the very facts of Mahoney and reaches Justice Maltbie's conclusion, see also Appendix at 295. In the absence of New York authority dictating a contrary view, we would therefore predict that the New York Court of Appeals would reject Mahoney and follow Justice Maltbie's dissent.
 
 
 13
 It is from this background that we approach East Hampton's contention that New York cases do require a contrary prediction. The two railroad fire cases cited, Fero v. Buffalo & State Line R.R., 22 N.Y. 209, 215 (1860), and Kalbfleisch v. Long Island R.R., 102 N.Y. 520 (1886), do not bear the weight East Hampton places upon them. In holding that an adjacent landowner's recovery was not affected, or at least need not be affected as a matter of law, by his placing inflammable materials near the tracks, the courts were giving effect not merely to some hostility to railroads but also to the principle, later stated in LeRoy Fibre Co. v. Chicago, M. & St. P. Ry., 232 U.S. 340, 349, 34 S.Ct. 415, 417, 58 L.Ed. 631 (1914): 'That one's uses of his property may be subject to the servitude of the wrongful use by another of his property seems an anomaly.' See Prosser, Torts, supra, 65 at 425. State Farm is not seeking to impose a 'servitude' on East Hampton's property; it is saying that if East Hampton failed to comply with standards laid down in the Syracuse Building Code, or inherent in the concept of reasonable care, for the protection of tenants, other persons in the building, the public and itself, it cannot recover damages due to such noncompliance.
 
 
 14
 The personal injury cases, typified by the well-known decision in McCahill v. New York Transp. Co., 201 N.Y. 221, 94 N.E. 616 (1911), likewise do not sufficiently advance East Hampton's cause. While that case held a negligent defendant liable for the death of an injured plaintiff who developed delirium tremens which would not have occurred 'except for the pre-existing alcoholic condition of the intestate,' 201 N.Y. at 223, 94 N.E. at 617, there was no suggestion that the decedent had been at fault; indeed, the concurring opinion indicates that McCahill was a rather moderate drinker. 201 N.Y. at 226, 94 N.E. at 618 (Vann, J.). Courts are understandably reluctant to review a plaintiff's life history and hold him guilty of contributory fault because of some previous overindulgence in a habit common to many which adds to the joy of life although at some risk to longevity. See also Nichols v. Colonial Beacon Oil Co., 284 App.Div. 581, 132 N.Y.S.2d 72 (3d Dep't 1954). East Hampton has cited no New York case contrary to O'Keefe v. Kansas City Western Ry., supra, 87 Kan. 322, 124 P. 416, where plaintiff was intoxicated at the time of defendant's wrongful act and the harm caused by the defendant might have been minimized had he been sober at that time. Contrast Dunham v. Village of Canisteo, 303 N.Y. 498, 104 N.E.2d 872 (1952) (evidence existed that deceased was intoxicated at time of a prior injury which defendant's wrongful act then aggravated). Intoxication by the plaintiff having a causal relation to the accident is a classical case of contributory negligence, Woods v. Board of Comm'rs, 128 Ind. 289, 27 N.E. 611 (1891); cf. Packard v. Quesnel, 112 Vt. 175, 182, 22 A.2d 164, 167 (1941); but contrast Prosser, Torts, supra, 32 at 154, and we see no reason for a different rule when it enhances the damages, e.g., if, after an automobile was disabled by an accident caused by defendant's negligence, an intoxicated occupant was injured from having weaved across the road rather than walking along the side.
 
 
 15
 We find even less force in East Hampton's argument about 'intervening cause.' This rests heavily on the Mahoney case, already discussed. While it is doubtless impossible to reconcile all the New York cases, it is now widely recognized that not every new force insulates a negligent defendant from liability or a plaintiff guilty of contributory fault from the consequences. The principle is limited to 'intervening causes which could not reasonably be foreseen, and which are no normal part of the risk created.' Prosser, Torts, supra, 44 at 281. Under the Restatement of Torts 2d 440-53, only certain intervening forces constitute a 'superseding cause' so as to relieve from liability. One principle of particular relevance here, is enunciated in 442B:
 
 
 16
 Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the face that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.
 
 
 17
 The very purpose of the substantive provisions of the Building Code here in question was to prevent the spread of fire; it is inconceivable that if the building was faultily constructed and someone on the fourth floor had been killed by the fire, East Hampton could have escapted liability because of the 'intervention' of the fire-- the very hazard at which the regulations were aimed. We perceive no reason for a different result when the issue is how far East Hampton's contributory culpability should becrease its own recovery.
 
 
 18
 This being the law as we see it, we can find no fault of which plaintiff can complain in the manner in which the judge told the jury to handle the case if it found the plaintiff to have been negligent. He said that 'if the damage would not hae been avoided or minimized even if there was no negligence' by the plaintiff, that was the end of the matter. 'However, if the absence of neglience on the part of the plaintiff would have avoided or minimized the damage, you may not make any award for such damages. In other words, whatever damages he brought about himself, you don't award him money for.' This seems clear enough to us; if it was in any respect erroneous, which we doubt, the error would have favored plaintiff.[2] In any event East Hampton's only objection was 'to any charging whatsoever on mitigation of damages.'
 
 
 19
 We therefore hold that the alleged faulty construction of the building was properly an issue and that there was no reversible error in the way in which the effect of any such construction on State Farm's liability was submitted to the jury.[3]
 
 III.
 
 20
 We must next consider whether there was sufficient evidence that faulty construction had occurred and that the fire would no have spread nearly so far without it, and whether the judge instructed the jury properly on how to evaluate such evidence. The evidence with respect to faulty construction was exceedingly diffuse. Our understanding of it is as follows:
 
 
 21
 The general basis of State Farm's claim of faulty construction was that the building lacked adequate fire stops to prevent either horizontal or vertical spread of fire. Each floor had a 'false' ceiling, with a space, called the plenum, between it and the concrete floor above. Sheetrock partitions were carried only to the false ceiling and not through the plenum, which would have prevented or retarded lateral spread. Each of the four floors had its own furnace. There were holes in the concrete floor, covered by grates, and the cold air falling through them into the plenum was sucked through the plenum by fans into the furnaces. According to State Farm, this had the result that once fire entered the plenum, it would spread throughout the building.
 
 
 22
 There was also much evidence as to alleged departures from the Syracuse Building Code effective in 1956-57, a violation of relevant provisions of which would constitute evidence of negligent construction.[4] The Code contained a provision that after floors were constructed, no opening greater than two square feet should be cut through them unless suitable metal framing or reinforcing was provided around the opening and that after pipes or conduits were in place, all openings around them should be filled in solidly with fireproof material unless approved, close-fitting individual sleeves were provided. East Hampton appears to be correct in contending that this provision was inapplicable, even if the cold air returns had been drilled after construction rather than created when the concrete was initially poured, since the holes were less than two square feet in area. Another provision of the Code, however, was important. This was that floors in certain buildings, apparently including the Romax Building, 'shall have a fire resistance of two hours or more.' State Farm adduced evidence that the cold air returns prevented the concrete floors in the Romax Building from having a fire resistance of anything close to this duration. It adduced other evidence to show that, to compensate for this defect and provide substantial compliance with the Code requirement, the plans approved by the Department of Engineering of the City of Syracuse had called for 5/8' gypsum fireboard to be attached to the top of the acoustical tile in the false ceiling; that the owner altered the plans to omit this; that, with the gypsum fireboard in place, the false ceiling would have had a fire rating of one hour-- an interval considerably longer than that between the onset of the fire and the arrival of the firemen after the delayed alarm; but that the fibre acoustical tile had no fire rating. Hence, State Farm argued, the omission of the gypsum behind the false ceiling, which took the building outside even substantial compliance with the Code requirement that the floor have two hour fire resistance, permitted the fire to enter the plenum, and thence to spread both vertically (through the cold air returns) and laterally (since the sheetrock partitions stopped at the false ceiling).
 
 
 23
 Somewhat apart from the alleged violation of the requirement that floors have a fire resistance of two hours, State Farm contended that the history just outlined demonstrated violation of another Code requirement, namely, that any desired changes in the plans or specifications bearing on Code provisions must be submitted for approval to the Superintendent of Buildings, having been signed by the architect or engineer in charge of the construction. No record of any such application for a modification in construction of the Romax Building could be found at the Department of Engineering-- although it must be said that the records there for this period were 'chaotic,' as the judge told the jury. State Farm therefore claimed that the omission of the gypsum fireboard was made without approval of the Superintendent of Buildings; that in such an instance the very purpose of the filing and approval requirement is to prevent spread of fire; and thus that omission of the gypsum was evidence of negligence under the Code in a second way.
 
 
 24
 East Hampton suggested at trial and has suggested on appeal a long series of answers to all this, only the more serious of which we will be able to deal with here, and none of which we consider adequate reason to find prejudicial error in the judge's charge or otherwise to set aside the verdict. First, it pointed out that it was not required to construct a building perfect by present standards but only one meeting standards recognized in 1956-57. The judge accepted this point and instructed the jury to that effect; evidence on the issue was conflicting-- in large part, but not exclusively, because as we shall next see, there was sufficient evidence for the jury to find violations of the Code then in effect with a causal relation to most of the damage. We will not disturb the jury's resolution of the question.
 
 
 25
 Second, with regard to Code violations themselves, plaintiff adduced considerable evidence that almost all buildings constructed fifteen or twenty years ago had holes in the floors, and it argues on appeal that the Code requirement of two hours' fire resistance in floors must therefore have referred to the resistance of the material of which the floors were constructed but not to the floors inclusive of holes. It says we cannot read into the Code then in effect any requirement with respect to holes beyond the explicit one quoted earlier in this opinion, which the Romax Building did not violate. While the argument is not without force, the jury was entitled to find from (1) a Code requirement that the floor 'have a fire resistance of two hours or more' and (2) testimony that the fire spread rapidly upward through the concrete floor-- albeit via holes-- that plaintiff was in violation of the Code. The judge correctly instructed the jury that a Code violation would be 'some evidence of negligence.' East Hampton also claims that the state of the records of the Department of Engineering negates any inference that an approval of modified plans was never obtained. The judge warned the jury to be cautious in drawing any such inference, and plaintiff was entitled to no more.
 
 
 26
 Third, plaintiff claims there was insufficient evidence that the faulty construction caused even part of the damage, in the but-for sense required (correctly in our view, see note 2 supra) by Judge Port's charge.[5] In particular, plaintiff tried to show that the extent of the fire was due not to the defects alleged by State Farm but to the fire's spreading through the door of State Farm's suite and then being caried upward because of a common 'curtain wall' construction, in which the innermost layer of the outer wall consists of aluminum which tends to buckle or distort out from the edge of the concrete floors in intense heat. There was also testimony, however, that the fire would never have reached the outer wall of the building if it had not passed into the plenum so that it could circumvent the sheetrock vertical partitions. Indeed, if the jury had found that construction flaws caused all the damage outside the recorder room in a but-for sense, there would have been testimony to support the finding. In light of this, and leaving aside for the moment the question whether the jury had any rational basis for the amount of its verdict, it follows a fortiori that there was evidence to support a finding that some $700,000 of damage, see note 7 infra, would not have occurred absent faulty construction. We note that plaintiff did not request any particular charge about the evidence on causation beyond the one given requiring but-for cause.
 
 
 27
 Finally, East Hampton argued that it was entitled in any event to rely on the architect and other experts it had employed and on the building's having repeatedly passed city building inspections. We know of no principle that a building which has passed inspection is per se absolved from a claim of negligent construction, and plaintiff requested no particular charge on the weight to be given that fact. As to the remainder of plaintiff's argument with respect to reliance on expertise, the judge once again acceped East Hampton's view and charged, substantially as requested, that the company had 'a right to rely on architects, engineers, furnace people, experts, within the area of their particular competence.' In consequence East Hampton can prevail on this issue only if it was entitled not simply to an appropriate charge but to a directed verdict. This is what East Hampton now seems to claim, citing Hardie v. Charles P. Boland Co., 205 N.Y. 336, 98 N.E. 661 (1912); Ryan v. Feeney & Sheehan Building Co., 239 N.Y. 43, 145 N.E. 321 (1924); and Person v. Cauldwell-Wingate Co., 187 F.2d 832, 835 (2 Cir.), cert. denied, 341 U.S. 936, 71 S.Ct. 855, 95 L.Ed. 1364 (1951), for the proposition that an owner or contractor is justified in relying on the experience and skill of an architect except where, as said in Person, quoting Hardie, 205 N.Y. at 340, 98 N.E. at 663, plans are 'so obviously defective that a contractor of average skill and ordinary prudence would not have attempted the construction according to the plan.'
 
 
 28
 One answer to this is that plaintiff's motions for a directed verdict did not make this point with the specificity fairly to be required after such a long and confused trial. A less technical answer is that the reliance defendse would have been inapplicable to what was probably State Farm's most important contention, namely, the omission of the fire-resistant gypsum backing to the acoustical tile, allegedly a change in the architect's plans initiated by the contractor. It would thus have been error to direct a verdict.
 
 
 29
 The judge might have done better to refrain from reading from the Building Code as extensively as he did, since, as he told the jury, some of the sections he had read had clearly not been violated. But counsel objected 'to the submission of any sections in regard to the Building Code,' which plainly went too far, and did nothing to help the judge pick and choose among sections. We thus hold there were jury issues with respect to faulty construction and causation of most of the damage thereby, and no reversible error in the manner of submission.
 
 IV.
 
 30
 This brings us to the most troubling aspect of the case, the lack of any mathematical basis in the record for the verdict of $120,000 in favor of East Hampton.[6]
 
 
 31
 Apart from the evidence submitted by Warner in support of its $27,000 claim, all that the jury had before it was an estimate that the cost of repairing the recorder room was between $5,000 and $6,000 (of which plaintiff's expert would substantiate only $1,000 as reasonable), that the cost of repairing State Farm's suite was between $15,000 and $20,000 (of which plaintiff's expert would substantiate only between $5,000 and $6,000), and that the cost of repairing the entire building, for loss of rentals, etc., was approximately $820,000 (of which plaintiff's expert substantiated fully $663,000 as reasonable by a procedure which omitted certain significant, admittedly legitimate items of damage). The absence of any other figures doubtless reflected the trial strategies of the parties, with East Hampton insisting it was entitled to the total damages since it was not at fault or, even more important, since any prior fault on its part was irrelevant, and State Farm contending that if it was liable at all, despite the provision in the lease, this was at most for damage to its own suite since the fire would not have spread further if the building had been properly constructed.
 
 
 32
 While one can conjecture that the $120,000 verdict was a compromise or that the jury adopted a rule of comparative negligence which New York has not yet been wise enough to establish we prefer to think it followed the judge's instructions and did not best it could with the meagre data the parties had furnished. In other words, it agreed with State Farm that the fire would not have spread so rapidly and widely if the building had been properly constructed but disagreed that the damage would have been contained quite so narrowly as State Farm had urged. The argument for setting the verdict aside, or for ruling that the jury should never have been allowed to attempt an allocation, really comes down to a claim that the damages were-- or at least on the present record are-- incapable of reasonable apportionment between the negligent plaintiff and the negligent defendant, and therefore if the defendant is responsible for some damage, it should be held for all. See Restatement of Torts 2d 465, comment c. Despite the Cross-reference in 465 to the 'rules' in 433A, which deal primarily with the case of a non-negligent plaintiff against two or more negligent defendants and the case of a non-negligent plaintiff who suffers harm partly from the defendant's negligence and partly from an innocent cause, and despite some mention of contributory negligence within 443A, we are not at all sure the situations are parallel. Where both defendants are negligent and there is no ready basis for apportionment, it is better to allow the plaintiff a full recovery against either and, under the statutes now generally in effect, let the defendant so cast in damages fight the apportionment battle with the other. Again, when plaintiff's injury is due in part to a defendant's negligence and in part to an innocent cause and apportionment is so difficult as to entail serious risk of undercompensation, it is more just not to attempt it. But when both plaintiff and defendant have been begligent, even an unscientific apportionment is more likely to be just than none at all. See O'Keefe v. Kansas City Western Ry., supra, 87 Kan. 322, 124 P. 146. But cf. Barry v. Coca Cola Co., supra, 99 N.J.Super. 270, 239 A.2d 273 (1967). Indeed, it is not plain that 465, comment c of the Restatement, by its invocation of 433A, distinguishes clearly between those cases of jointly caused damage in which full liability should be imposed on defendant and those in which plaintiff should be altogether barred. Cf. 433A, Illustration
 
 
 33
 17. A case where both plaintiff and defendant have been negligent bears a close resemblance to the situation of joint tort-feasors, and we find it not without significance that in the areas of contribution and indemnity, New York has recently departed from the former ritualistic distinction between 'active' and 'passive' negligence and has opted for a course that will necessarily call for apportionments between negligent defendants no more scientific than the jury made here. Dole v. Dow Chemical Co., 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972).
 
 
 34
 It may well be that if East Hampton had not banked so heavily on getting a full recovery, a trial strategy we might well have followed had we been its counsel, it could have supplied intermediate figures that would have led to a higher award than the jury made. Having chosen to play for a 100% Recovery, it cannot be heard to complain that, because of its failure to supply the jury with alternatives, it may have fared worse than it should.[7] We are inevitably reminded of Judge Medina's classic opinion in Achilles v. New England Tree Expert Co., 369 F.2d 72, 74 (2 Cir. 1966). This is a case of upstate New York justice, as that was of Vermont's. Call the verdict what one will, 'it does substantial justice and we will not disturb it.' Indeed we are not altogether sure we could. Cf. Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 484-485, 53 S.Ct. 252, 77 L.Ed. 439 (1933).
 
 V.
 
 35
 In view of our disposition the only other matter requiring a ruling is State Farm's appeals from the denials of two motions for leave to serve a third party summons and complaint under F.R.Civ.P. 14. Apparently resistance to these denials is the only real motive for State Farm's appeal of the Warner verdict.
 
 
 36
 In the first motion, which was made shortly before the trial, State Farm sought to serve such a complaint on East Hampton with respect to any liability that might be imposed on State Farm with respect to Warner. In the second, filed long after the trial and, indeed, after the notices of appeal, it sought to serve not only East Hampton but also Rosen, M. L. Rosen Management Co., and Rosen-Klein Construction Co., Inc., with respect to the $25,000 liability to Warner which by then had been imposed on State Farm. It was urged that the situation had changed in view of the intervening decision in Dole v. Dow Chemical Co., supra, 30 N.Y.2d at 153, 331 N.Y.S.2d at 391-392, 282 N.E.2d at 295, holding that the 'Right to apportionment of liability or to full indemnity, then, as among parties involved together in causing damage by negligence, should rest on relative responsibility and to be determined on the facts,' and repudiating the former 'active-passive' negligence test.
 
 
 37
 We see no reason to disturb the orders of the district judge. The court acted well within the discretion afforded by F.R.Civ.P. 14(a) in denying the first motion as untimely, and State Farm has conceded as much on appeal. Issue in the Warner case had been joined in January 1971, but the motion was not made for a year and was heard only on the eve of trial. As to the second motion the district court lacked power to grant this since appeals to this court had already been taken. See Merritt-Chapman & Scott Corp. v. City of Seattle, 281 F.2d 896 (9 Cir. 1960), overruled in part not directly relevant here, Ruby v. Secretary of U.S. Navy, 365 F.2d 385 (9 Cir. 1966), cert. denied, 386 U.S. 1011, 87 S.Ct. 1358, 18 L.Ed.2d 442 (1967); Ryan v. United States Lines, 303 F.2d 430 (2 Cir., 1962). Our affirmance of Warner's judgment against State Farm is not intended to preclude the district court from acting on State Farm's motion once the mandate has issued. Perhaps it may decide to let well enough alone.
 
 
 38
 The judgments are affirmed, with costs to Warner against State Farm and to State Farm against East Hampton.
 
 
 
 [1]
 In addition to the arguments outlined in text, State Farm devotes four lines of its brief to a claim that statements made by its employees after the fire was reported were improperly admitted. It does not cite the statements and we shall not search the record for them. State Farm also appears at times to go through the form of questioning whether its negligence was a cause of Warner's loss. The jury was so clearly entitled to find that this was both a but-for and a proximate cause that such an argument would not merit discussion. Cf. section V infra
 
 
 [2]
 Conceivably, as defendant suggests, the New York courts would hold, using contributory negligence language, that recovery by plaintiff is barred altogether if any portion (or any substantial portion) of the harm would have been avoided by proper construction, but cf. Dole v. Dow Chem. Co., 30 N.Y.S.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972), discussed in part IV infra; see also O'Keefe v. Kansas City Western Ry., supra, 87 Kan. 322, 124 P. 416. Even if we were to believe that New York would adopt such a rule, however, East Hampton obviously could not complain of a failure to apply it
 
 
 [3]
 On the question of any special difficulties raised by the form of submission in this case because of the absence of an evidentiary basis on which the jury could apportion damage between causes, cf. section IV infra
 
 
 [4]
 We reject East Hampton's contention that while violation of a statute or regulation by a defendant can be considered as evidence of negligence, such violation by a plaintiff cannot be considered as evidence of contributory negligence. The reasons are well stated in Prosser, Torts, supra, 36 at 203, and need not be repeated here
 
 
 [5]
 Plaintiff relies heavily on Schectman v. Fils, 30 A.D.2d 878, 293 N.Y.S.2d 55 (2d Dep't 1968), aff'd, 25 N.Y.2d 700, 306 N.Y.S.2d 954, 255 N.E.2d 182 (1969), in support of this claim. As the claim is a factual one, it is difficult to see what mileage plaintiff gets out of Schectman
 
 
 [6]
 State Farm argues that East Hampton 'did not object to submitting the task of deciding the amount of damages to the jury, so is barred now from asserting that the decision of the jury is error.' It is difficult to see how much more objection plaintiff could have registered in advance to submission to the jury than to request a directed verdict and to object to any charge on mitigation of damages, both of which steps East Hampton took. Plaintiff could hardly be held to know in advance that the jury would reach a result plaintiff considers without mathematical basis; and as soon as that result came in, plaintiff objected to it on precisely this ground in its motion for judgment notwithstanding verdict. In sum, plaintiff adequately protected its rights to appeal this point
 
 
 [7]
 Indeed, it is not difficult to conceive a line of reasoning which the jury might have followed to reach the verdict that it did. Plaintiff's expert testified that if the area of the State Farm suite was about 500 square feet, which he believed it was, then the cost of repairing it would have been between $5,000 and $6,000-- a ratio of just over ten dollars per square foot. Plaintiff's reply brief tells us that the area of the entire third floor was 11,000 square feet. The jury could have reasoned that the damage throughout the third floor would all have occurred, by spread of the fire through doorways and so on, regardless of quality of construction, but that the fire department could have stopped the fire from climbing via the curtain walls had the gypsum been in place. If it applied the ratio of just over ten dollars per square foot to the entire 11,000-square foot third floor and chose to disregard or make only minor allowance for loss of rentals and for water damage to the lower floors, its verdict would be readily explicable
 We do not mean by this to say that this is what the jury did or what we would have done. But if the jury had in fact done this, we surely would not set the verdict aside.