Reid L. **FELDMAN, as Administrator of the Estate of Nancy Feldman, Deceased, Plaintiff-Appellee-Cross-Appellant,**

v.

**ALLEGHENY AIRLINES, INC., Defendant-Appellant.**

**Nos. 725, 817, Dockets 74–2299, 74–2357.**

United States Court of Appeals, Second Circuit.

Argued April 11, 1975.

Decided Sept. 30, 1975.

William R. Moller, Wesley W. Horton, Hartford, Conn., for appellant.

John W. Douglas, G. R. Poehner, Washington, D. C., Peter B. Cooper, New Haven, Conn., for appellee-cross-appellant.

Before FRIENDLY and OAKES, Circuit Judges, and LASKER, District Judge.*

LASKER, District Judge:

On June 7, 1971, an Allegheny Airlines flight crashed in fog while approaching New Haven Airport. Nancy Feldman, a passenger, died, in the crash. Allegheny conceded liability, and the parties submitted the issue of damages to Judge Blumenfeld of the United States District Court for the District of Connecticut.[1] The airline appeals[2] from Judge Blumenfeld's judgment awarding $444,056. to Reid Laurence Feldman, as administrator of the estate of his late wife.

■■ Determination of damages in this diversity. wrongful death action is governed by Connecticut law, specifically Conn.Gen.Stats. § 52–555, which measures recovery by the loss to the decedent of the value of her life rather than by the value of the estate she would have left had she lived a full life. *Perry v. Allegheny Airlines, Inc.*, 489 F.2d 1349, 1351 (2d Cir. 1974); *Floyd v. Fruit Industries, Inc.*, 144 Conn. 659, 669–671, 136 A.2d 918, 924 (1957). In accordance with Connecticut law, the judgment represented the sum of (1) the value of Mrs. Feldman's lost earning capacity and (2) the destruction of her capacity to enjoy life's non-remunerative activities, less (3) deductions for her necessary personal living expenses. No award was made for conscious pain and suffering before Mrs. Feldman's death because the evidence on this point was too speculative, nor did the award include pre-judgment interest.

Damages in a wrongful death action must of necessity represent a crude monetary forecast of how the decedent's life would have evolved. Prior to stating his specific findings, the district judge noted, and we agree, that "[t]he whole problem of assessing damages for wrongful death . . . defies any precise mathematical computation," citing *Floyd v. Fruit Industries, Inc., supra,* 144 Conn. at 675, 136 A.2d at 927 (382 F.Supp. at 1282).

It is clear from Judge Blumenfeld's remarkably detailed and precise analysis that he nevertheless made a prodigious effort to reduce the intangible elements of an award to measurable quantities. It is with reluctance, therefore, that we conclude that his determination of loss of earnings and personal living expenses must be remanded.

I.

*Damages for Destruction of Earning Capacity.*

Nancy Feldman was 25 years old at the time of her death. From 1968 until shortly before the plane crash, she lived and worked in New Haven while her husband studied at Yale Law School. On Mr. Feldman's graduation from law school in the spring of 1971 the Feldmans moved to Washington, D. C., where they intended to settle. At the time of her death, Mrs. Feldman had neither accepted nor formally applied for employment in Washington, although she had been accepted by George Washington Law School for admission in the Fall of 1971 and had made inquiries about the availability of employment.

A key objection of appellant Allegheny runs to Judge Blumenfeld's calculation of the discount rate at 1½% in determining the present value of Mrs. Feldman's lost earning capacity on the grounds that the court has no right to take inflation into account in any way in its assessment of damages. The district court decided that the appropriate rate of discount would be the "price of capital," such to be "obtained by adjusting inter-

---

\* Of the United States District Court for the Southern District of New York, sitting by designation.

1. Judge Blumenfeld's detailed opinion is reported at 382 F.Supp. 1271.

2. Mr. Feldman filed a cross-appeal to enable him to argue that, if this court were inclined to adopt some of Allegheny's contentions, "there are other damage elements, not recognized by the District Court which would offset any reduction in the award and thus justify a judgment of $444,056." We disagree that Judge Blumenfeld failed to recognize any appropriate element of damages.

est rates on 'risk-free' investments so as to exclude the additional interest demanded by the investment market as compensation for investors' assumption of the risk of inflation." 382 F.Supp. at 1293.

In calculating the discount rate, the appellee's expert, relied on by the district court, used an average earnings of 4.14% (from mutual savings bank investments) as representative of a prudent, non-sophisticated investment and subtracted 2.87% as the average yearly inflation rate revealed in the Department of Labor's Consumer Price Index over an 18-year period, yielding a 1.27% difference which was rounded up to 1.5%. Judge Blumenfeld corroborated this "inflation-adjusted discount rate" of 1.5% by calculating the real yields of investments since 1940 in federal government securities (with inflation factored out) from the 1974 Economic Report of the President, a source referred to by appellant Allegheny's expert. The district court made this calculation according to its view of Connecticut's law and policies on the subject of inflation accounting in wrongful death damages.

 We agree with the district court's interpretation of Connecticut law as leaving open the question how inflation may be accounted for in such damages.[3] We believe that Judge Blumenfeld, a long-time Connecticut lawyer and district court judge for 14 years, appropriately hypothesized the Connecticut Supreme Court's favorable reaction to a discount rate adjustment, since Connecticut, unlike most jurisdictions, reduces what would otherwise be inflated judgments for wrongful death injuries by requiring deduction of income taxes payable on future earnings. *Floyd v. Fruit Industries, Inc., supra,* 144 Conn. at 673, 136 A.2d at 926.

The district court was fully aware that in a way it was being speculative in what it was doing, as every trier of fact is required to some extent to be whenever it engages in calculating future earnings and a lump sum discount rate. 382 F.Supp. at 1291–92. As a matter of federal law we do not necessarily vouchsafe either the principle of making an "inflation adjustment" in setting a discount rate[4] or the means by which it was done in this instance. Yet we note that consideration of inflation has historically been approved in a number of state courts. See, e. g., *Halloran v. New England Telephone & Telegraph Co.,* 95 Vt. 273, 276, 115 A. 143, 144 (1921) and cases cited in Judge Blumenfeld's opinion, 382 F.Supp. at 1290. As a matter of federal law, at least one circuit has approved jury consideration of the impact of inflation and even reversed for charging that it should not consider "future increases or decreases in the purchasing power of money." *Bach v. Penn Central Transportation Co.,* 502 F.2d 1117, 1122 (6th Cir. 1974); see also *Sleeman v. Chesapeake & Ohio Railway Co.,* 414 F.2d 305 (6th Cir. 1969). Our own *Perry v. Allegheny Airlines, Inc., supra,* 489 F.2d 1349, affirmed a $369,400. judgment on a jury verdict for the estate of another victim of the very same crash here involved; while the point was not discussed specifically in the opinion it is interesting that Judge Blumenfeld's charge to the jury referred to the plaintiff's expert's testimony on a 1.5% discount rate and the underlying rationale therefor, a reference duly attacked on

---

3. Connecticut law requires discounting the lump sum representing loss of earning capacity (*Chase v. Fitzgerald,* 132 Conn. 461, 45 A.2d 789 (1946)), less income taxes that would be paid (*Floyd v. Fruit Industries, Inc.,* 144 Conn. 659, 136 A.2d 918 (1957)). In *Quednau v. Langrish,* 144 Conn. 706, 714, 137 A.2d 544, 549 (1957), the court reserved judgment whether a case "could arise in which it would be proper to charge the jury that they should take into consideration the depreciated value

of the dollar in assessing damages." The Connecticut courts' position thus does not pose the bar to explicit consideration of an inflation factor by the fact-finder which the Nebraska court's position did in *Riha v. Jasper Blackburn Corp.,* 516 F.2d 840, 843 (8th Cir. 1975).

4. We refer specifically to the situation as here where inflation is not taken into account in calculating the amount of damages from most earning capacity.

appeal by Allegheny. Commentators have supported an accounting for inflation in damage awards, *see* Econometrics and Damages, 44 Wash.L.Rev. 351, 360–61 (1969); Comment, 6 U.S.F.L.Rev. 311 (1972). It has even been suggested that a trial court may be in error in failing to account fully for inflation in wrongful death damages in a non-diversity case. See *Mills v. Tucker*, 499 F.2d 866, 868 (9th Cir. 1974).[5] As Judge Friendly himself said in *McWeeney v. New York, New Haven and Hartford Railroad Co.*, 282 F.2d 34, 38 (2d Cir. 1960):

> "There are few who do not regard some degree of continuing inflation as here to stay and would be willing to translate their own earning power into a fixed annuity, and it is scarcely to be expected that the average personal injury plaintiff will have the acumen to find investments that are proof against both inflation and depression—a task formidable for the most expert investor." (Footnote omitted.)

Within the latitude afforded by the Connecticut decisions, note 3 *supra*, and with the support in the historical and other economic evidence before him that Judge Blumenfeld had, we cannot fault him for computing the discount rate by offsetting the anticipated rate of earnings from investment of the lump sum to be awarded, by an inflation factor.

■ In computing the value of Mrs. Feldman's lost earning capacity, the trial judge found that Mrs. Feldman's professional earnings in her first year of employment would have been $15,040. and that with the exception of eight years during which she intended to raise a family and to work only part time, she would have continued in full employment for forty years until she retired at age 65. The judge further found that during the period in which she would be principally occupied in raising her family, Mrs. Feldman would have remained sufficiently in contact with her profession to maintain, but not increase, her earning ability. Pointing out that under Connecticut law damages are to be based on "the loss of earning *capacity*, not future earnings per se . . ." (382 F.Supp. at 1282) (emphasis in original), the judge concluded that when a person such as Mrs. Feldman, who possesses significant earning capacity, chooses to forego remunerative employment in order to raise a family, she manifestly values child rearing as highly as work in her chosen profession and her loss of the opportunity to engage in child rearing "may thus fairly be measured by reference to the earning capacity possessed by the decedent" (382 F.Supp. at 1283). Applying this rationale, the trial judge made an award for the eight year period of $17,044. per year, the salary which he computed Mrs. Feldman would have reached in the year preceding the first child-bearing year, but did not increase the amount during the period.

■ We believe the trial judge erred in automatically valuing Mrs. Feldman's loss for the child-bearing period at the level of her salary. As Judge Blumenfeld's opinion points out, the Connecticut cases distinguish clearly between loss of earning capacity and loss of capacity to carry on life's non-remunerative activities. As we read Connecticut law, where a decedent suffers both kinds of loss for the same period each must be valued independently in relation to the elements particular to it.

The court in *Floyd v. Fruit Industries, Inc., supra,* equated "earning capacity" with "the capacity to carry on the particular activity of earning money." 144 Conn. at 671, 136 A.2d at 925. Here the evidence established, and the trial court found, that Mrs. Feldman would have worked only part-time while raising a family. In the circumstances, we believe that under the Connecticut rule the plaintiff is entitled to recover "loss of earnings" for the child raising years only to the extent that the court finds that Mrs. Feldman would actually have

---

**5.** But see *Johnson v. Penrod Drilling Co.*, 510 F.2d 234 (5th Cir. 1975) (en banc, 12–3 on issue of inflation), petition for cert. filed, 43 U.S.L.W. 3684 (June 24, 1975).

worked during those years. For example, if the court finds that she would have worked 25% of the time during that period, the plaintiff would properly be credited only with 25% of her salary for each of the eight years.

This conclusion is consistent with the other leading authority in Connecticut. In *Chase v. Fitzgerald,* 132 Conn. 461, 45 A.2d 789 (1946), an award for "loss of future earnings" was denied in respect of a decedent who had been employed as a housekeeper, but who at the time of her death was a housewife with no intention of seeking outside employment. The court held that any award for wrongful death in such a case should be based not on the decedent's loss of earning capacity, but rather on her "loss of the enjoyment of life's activities." 132 Conn. at 470, 45 A.2d at 793. Consistently with the holding in *Chase,* we conclude that any award in relation to the portion of the child-raising period during which Mrs. Feldman would not have been working must be predicated on her "loss of the enjoyment of life's activities" rather than on loss of earnings, and on remand the district judge should re-evaluate the elements accordingly.

We recognize that thus computed the total award for Mrs. Feldman's child-raising years may be similar to that already made, but conclude that the conceptual framework we have described is required by Connecticut's distinctive law of damages.

## II.

### Deductions for Decedent's Necessary Personal Living Expenses.

■■■■ Where the decedent had been subject to the expense of self-maintenance, Connecticut case law provides for the deduction of "personal living expenses" from damages otherwise recoverable for the loss of earning capacity. *Floyd v. Fruit Industries, Inc., supra,* 144 Conn. at 674, 136 A.2d at 926. Judge Blumenfeld properly held that although a husband under Connecticut law has a duty to support his spouse, (see, *e. g.,*

Conn.Gen.Stats. §§ 46–10; 53–304), that duty does not exempt an income-earning wife from an obligation to apportion a part of her income for her own support. The *Floyd* court defined the term "personal living expenses" as:

" . . . those personal expenses which, under the standard of living followed by a given decedent, it would have been reasonably necessary for him to incur in order to keep himself in such a condition of health and well-being that he could maintain his capacity to enjoy life's activities, including the capacity to earn money." 144 Conn. at 675, 136 A.2d at 926–927.

The trial judge concluded that, under Connecticut law, deductions for Mrs. Feldman's personal living expenses should include the cost, at a level commensurate with her standard of living, of food, shelter, clothing and health care. The judge fixed such costs in Washington, D. C. for the year following her death at $2,750., increasing that figure by 3% per year to the age of retirement. After retirement, living expenses were deducted at the rate of $5,000. annually. These figures were discounted annually by 1.5% to reduce the deduction to present value. Although the process by which the trial judge determined the level of Mrs. Feldman's living expenses was proper, we believe that he substantially underestimated the actual costs of food, shelter, clothing and health care.

■■■ On direct examination, Mr. Feldman testified that his wife's personal living expenses in New Haven had been approximately $2,120. per year. On cross-examination, this figure was shown to have been unduly conservative with regard to clothing and food, and the trial judge rounded the amount to $2,200. He found that the Feldmans' cost of living would have increased after they moved to Washington, where living expenses were higher and their social and economic status would have changed from that of students to that of young professionals. Accordingly, the judge adjusted the $2,200. figure upward by 25% for the

first year Mrs. Feldman would have resided in Washington, and by 3% annually until she would have reached the age of sixty-five and retired. Personal living expenses for that year were calculated to be $6,675, but during the years of retirement deductions were lowered to $5,000., a level which the trial judge felt was consistent with a high standard of living but also reflected the fact that the cessation of work often produces a reduction in personal expenditures.

We recognize the perils involved in an appellate court dealing de novo with factual matters. We would not venture to do so in this case if we did not feel we have the right to take judicial notice of the facts of life, including the cost of living for those in the position of the Feldmans in such metropolitan areas as Washington, D. C. We reluctantly conclude that the trial judge was in error in computing living expenses at $2,750. for the year after Mrs. Feldman's death, and building ôn that base for later years.

Without attempting to specify what the results of such a computation should be, we believe that it would fall more nearly in the area of $4,000., including approximately $25. per week for food, $125. per month for rent, $1,000. annually for clothing and $400. annually for health care. For one year the difference between the trial judge's figure of $2,750. and the suggested figure of $4,000. may be considered de minimis in relation to the total award. However, projected over the 52 years of Mrs. Feldman's life expectancy, and at an annual increase of 3%, the difference is sufficiently large to require us to remand the matter for further determination by the trial judge.

We have considered the other points raised by Allegheny and find them to be without merit.

The judgment is affirmed in part, reversed in part and remanded.

FRIENDLY, Circuit Judge (concurring dubitante):

This case is another example of a federal court's being compelled by the Congressional grant of diversity jurisdiction to determine a novel and important question of state law on which state decisions do not shed even a glimmer of light.[1] The question here, how far awards of damages for disabling personal injury or for death shall attempt to make allowance for future inflation, is of great concern to the states since awards like that made here will further escalate the heavily mounting burden of liability insurance costs. The state decisions and the federal cases endeavoring to ascertain state law are in a stage of uncertainty and flux. So too are the decisions with respect to federal law. Compare *Sleeman v. Chesapeake & Ohio Railway Co.,* 414 F.2d 305 (6 Cir. 1969), with *Bach v. Penn Central Transportation Co.,* 502 F.2d 1117, 1122 (6 Cir. 1974). In a case of federal law, the Fifth Circuit recently granted *en banc* consideration and by a vote of twelve to three expressly disapproved a district court's effort, in computing lost future earnings, to take account of possible inflationary trends over a period of several decades on the ground that "the influence on future damages of possible inflation or deflation is too speculative a matter for judicial determination." *Johnson v. Penrod Drilling Co.,* 510 F.2d 234, 236, 241 (5 Cir. 1975) (*en banc*), petition for certiorari filed, 43 U.S.L.W. 3684.

Both plaintiff's expert and the court allowed for inflation not by building cost-of-living increases into future earnings but by applying a rate of only 1.5% in discounting to present value estimated

---

1. In recent years we have had many cases in which we have been obliged largely to improvise state law. See, e. g., *Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel,* 490 F.2d 509 (2 Cir. 1973); *East Hampton Dewitt Corp. v. State Farm Mutual Automobile Ins. Co.,* 490 F.2d 1234 (2 Cir. 1973); *Modave v. Long Island Jewish Medical Center,* 501 F.2d 1065 (2 Cir. 1974). Despite the sincere respect that I have for Judge Blumenfeld and his long years of experience as a Connecticut practitioner and federal district judge, I do not believe that he, or anyone else, can make any reliable prediction what the Supreme Court of Connecticut would do with the exceedingly difficult question here discussed.

lost future earnings and other recoverable values calculated in 1971 dollars. The district court derived this 1.5% figure by comparing rates of return on a number of "risk-free" securities issued by the federal government (plaintiff's expert examined other types of "risk-free" fixed income investments and reached similar conclusions) since 1940 with rates of inflation during the same period as reflected by annual changes in the Consumer Price Index. The court subtracted the latter from the former on the theory that the latter amounted to that portion of the return representing what investors have historically demanded as protection against inflation. The difference varied from year to year, but the court determined that 1.5% was a representative figure for the period. This was deemed to be "that part of the annual yield which constitutes payment for the use of capital" or "real yield"—presumably the rate of return which investors would be willing to accept in an inflation-free economy; while the rate of inflation might rise and fall, investors could be expected to demand about 1.5% return on safe investments in addition to protection against expected inflation. The court recognized that other courts have been reluctant to take explicit account of the effects of future inflation (see 510 F.2d at 236 n.1) but stated that its approach in fact was "a means to avoid undue speculation" with respect to future inflation and even suggested that when, as in this case, the effects of future inflation have been expressly excluded in the calculation of the amount to be discounted, the "appropriate rate of discount" must necessarily be adjusted so that "the additional interest demanded by the investment market as compensation for investors' assumption of the risk of inflation" is excluded. The distinction drawn between this method and the one more commonly used—adjusting the amount to be discounted so as to include a sum reflecting assumptions about future inflation—apparently given some weight by the majority—is more apparent than real.

Plaintiff's expert acknowledged that "another approach" or "alternative calculation" for this problem would be to increase estimated lost future compensation and living expenses to take account of the effects of future inflation and not reduce the rate of return used for discounting by any amount reflecting inflation. The outcome of the calculation under either approach would be very nearly identical. Indeed, at one point counsel for plaintiff asked his expert to calculate the present value in 1971 dollars of the deceased's lost earnings based upon the "speculative" assumption of an inflation rate of 4.5% and a rate of return of 6%. This approach would have reduced the recovery by less than $2,000 out of approximately a quarter of a million dollars.

In any event, plaintiff's expert came up with a $253,424 present value of Mrs. Feldman's projected earnings. Using higher starting and ending salary figures and a different percentage deduction for income taxes, the judge arrived at an initial sum of $499,953 to which he added $100,000, admittedly drawn from the atmosphere, "for the destruction of the decedent's capacity to enjoy life's activities", an element recognized as appropriate for consideration by Connecticut law, and from which he subtracted $155,897 as the discounted sum of personal living expenses, yielding a total recovery of $444,056. On the judge's computations, Mrs. Feldman, who had been earning $10,000 a year at the time of her death in 1971, would be earning $33,757 in 1971 dollars in 2011 as a "legislative analyst" for the National League of Cities and United States Conference of Mayors (NLC/USCM), when she would have attained the age of 65. However, as counsel for Allegheny points out, without dispute from counsel for Mr. Feldman and apparently based upon the testimony of plaintiff's expert about an alternative method of calculation discussed above, a calculation deducting 4.5% for inflation from a 6% interest rate assumed to be attainable on an investment free from risks other than inflation implicitly car-

ries the prediction that Mrs. Feldman, and also all federal employees in the GS 16–7 category (which Mrs. Feldman hypothetically would reach after 40 years under the scheme for predicting merit pay increases adopted by the court), would in fact be earning $122,823 in the year 2011. Similar calculations based upon maintaining the 1.5% differential could yield even more striking results, which are largely veiled by the court's approach. One point that immediately occurs is why, if Mrs. Feldman's salary would rise to such a figure, income tax, deductible from damages under Connecticut law, should be computed at only 25%, a rate which the court found would achieve "substantial justice." It is common knowledge that one effect of inflation is that the same progressive rates of income tax take an ever larger bite out of real income, and it is unlikely in the last degree that, in an era of increasing budgets, due in considerable part to inflation, Congress would make the accommodation needed to prevent this.

Save for this important point not urged by Allegheny and the two corrections made by the majority, I have no reason to question the meticulous calculations of the able district judge. Indeed one could argue that, at a time when the national goal is simply to bring back the golden age of single rather than double digit inflation, without too much question what the single digit should be, the entire interest return on otherwise risk-free investments, today probably in excess of 6%, represents compensation against the risk of inflation; in other words, investors in fixed income securities are willing, for the time being, to forego any return if they can keep the real amount of their investment intact. Indeed, insofar as the return is subject to income tax, they are not even achieving that. Yet common sense suggests that investors will not tolerate such a situation indefinitely.

I doubt whether judges, or anyone else, can peer so far into the future; the district court's computations suffer from what Mr. Justice Holmes, in another context, called "[t]he dangers of a delusive exactness," *Truax v. Corrigan,* 257 U.S. 312, 342, 42 S.Ct. 124, 133, 66 L.Ed. 254 (1921) (dissenting opinion). Instead of recognizing the plethora of uncertainties as the Fifth Circuit has done, see *Johnson v. Penrod Drilling Co., supra,* 510 F.2d at 236, compare *Frankel v. United States,* 321 F.Supp. 1331, 1346 (E.D.Pa. 1970), aff'd, 466 F.2d 1226 (3 Cir. 1972), the court below endeavored to construct an iron-clad guaranty against the unknown and unknowable future effects of inflation. The estate of a young woman without dependents is hardly an outstanding candidate for a forty-year protection against inflation not enjoyed at all by millions of Americans who depend on pensions or investment income and not fully enjoyed by millions more whose salaries have in no wise kept pace with inflation.

The court necessarily assumed not only continued inflation, which unhappily seems likely in some degree, but continued responsiveness to it by equivalent wage increases. Yet we have seen in recent months that employers, particularly municipalities, simply cannot maintain these. Thousands of New York City's employees have been dismissed and the rest are being subjected to a wage freeze. Other important cities may not be far behind in having to resort to similar measures. Under such conditions can we be sure that NLC/USCM would continue to grant automatic cost-of-living pay increases for 40 years, as the court assumed? Perhaps so, since the main business of NLC/USCM is seeking to obtain federal funds for cities, which surely is a boom industry if any there be; but perhaps not.

I would also question the likelihood—indeed, the certainty as found by the court—that, despite her ability, determination and apparent good health, Mrs. Feldman would have worked full time for forty years until attaining age 65, except for the eight years she was expected to devote to the bearing and early rearing of two children. Apart from

the danger of disabling illness, temporary or permanent, there would be many attractions to which the wife of a successful lawyer might yield: devoting herself to various types of community service, badly needed but unpaid, or to political activity; accompanying her husband on business trips—often these days to far-off foreign countries; making pleasure trips for periods and at times of the year inconsistent with the demands of her job; perhaps, as the years went on, simply taking time off for reflection and enjoyment. Granted that in an increasing number of professional households both spouses work full time until retirement age, in more they do not. Surely some discount can and should be applied to the recovery for these reasons.

My guess is also that, even if inflation should be taken into account, neither a Connecticut nor a federal jury would have made an award as large as was made here. I say this despite the $369,-400 jury verdict for another death arising out of the same crash which we sustained in *Perry v. Allegheny Airlines, Inc., supra,* 489 F.2d 1349, where we did not expressly discuss the inflation question. Even though the existence of dependents is legally irrelevant under the Connecticut survival statute, a jury would hardly have ignored that, whereas Perry was survived by a dependent wife and five children ranging from 6 to 14 years in age, Mrs. Feldman had no dependents. More significant to me is that in Perry's case the jury awarded only $369,400 as against the $535,000 estimate of Mrs. Perry's expert for economic loss alone; here the judge was more generous in important respects than plaintiff's expert.

However, I am loathe to require a busy federal judge to spend still more time on this diversity case, especially when I do not know what instructions to give him about Connecticut law. Some of the questions I have raised are not open for exploitation by the defendant since its own expert made his calculations on the basis that Mrs. Feldman would work until age 65. Although in-tuition tells me that the Supreme Court of Connecticut would not sustain the award made here, I cannot prove it. I therefore go along with the majority, although with the gravest doubts. I do this on the basis that, as far as I am concerned, the decision will not constitute a precedent on the inflation problem in a case arising under federal law. Judgments like Mr. Feldman's and Mrs. Perry's also inevitably raise serious policy questions with respect to damages in airline accident cases beyond those here considered, but these are for Congress and not for the courts.