552 So.2d 1089 (1989)
DELTA AIR LINES, INC., Defendant-Appellant,
v.
Harold AGELOFF, et al., Plaintiffs-Appellees.
No. 73729.
Supreme Court of Florida.
October 26, 1989.
Rehearing Denied December 26, 1989.
Thomas E. Ice of Barwick, Dillian, Lambert & Angel, P.A., Miami Shores, for defendant-appellant.
Philip M. Burlington of Edna L. Caruso, P.A., and Robert M. Montgomery, Jr. of Montgomery and Larmoyeux, West Palm Beach, for plaintiffs-appellees.
GRIMES, Justice.
Pursuant to section 25.031, Florida Statutes (1987), and Florida Rule of Appellate Procedure 9.150, the United States Court of Appeals for the Eleventh Circuit has certified to this Court certain questions concerning the Florida Wrongful Death Act. We have jurisdiction. Art. V, § 3(b)(6), Fla. Const.
The joint statement of facts which was submitted together with the certified questions states:
Scott Ageloff was a passenger who died in the crash of Delta Air Lines (hereinafter "Delta") Flight 191 at the Dallas-Ft. Worth Regional Airport on August 2, 1985. At the time of his death, the Decedent was twenty-nine years old and was employed by the Ageloff family-owned toy business, Harry's Kidsworld, Inc., (hereinafter "Kidsworld") in which he owned a 25% share.
In January of 1986, Ageloff's parents, in their capacities as Personal Representatives of his estate, brought a wrongful death action against Delta Air Lines in the United States District Court for the Southern District of Florida. Subject matter jurisdiction was invoked based on the diversity of citizenship of the parties, pursuant to 28 U.S.C. § 1332. The parties stipulated that Delta would not contest liability for compensatory damages and that the Estate would waive all other *1090 claims for damages, including any claim for punitive damages. The case proceeded to a jury trial solely on the issue of damages under the Florida Wrongful Death Act, Fla. Stat. § 768.16-768.27. Since Ageloff was unmarried and had no dependents, the sole issue for the jury to determine was the loss of prospective net accumulations to his estate reduced to present money value.
Prior to trial, Delta filed a Motion in Limine objecting to testimony of the Plaintiffs' experts regarding any investment return on Ageloff's future savings. The Defendant's position was that the investment yield on future savings was not a proper component of net accumulations as defined in Fla. Stat. § 768.18(5). That provision defines "net accumulations" as that portion of the Decedent's expected net business and salary income that probably would have been retained as savings and left as part of his estate if he had lived his normal life expectancy. "Net business and salary income" is further defined as "the part of the Decedent's probable gross income after taxes, excluding income from investments continuing beyond death, that remains after deducting the Decedent's personal expenses and support of survivors, excluding contributions in kind." Plaintiffs claimed that investment yield on future savings does not constitute "income from investments continuing beyond death" and was, therefore, a proper element of net accumulations, as defined in § 768.18(5). After hearing argument at trial, the District Court denied Delta's Motion in Limine.
At trial, the Plaintiffs presented expert testimony of Dr. Irving Goffman, an economist, and Dr. Jonathan Cunitz, a financial consultant, regarding the value of the Estate's net accumulations. Dr. Goffman began by postulating that in fiscal 1985 the amount of remuneration Ageloff earned, as opposed to the amount he actually received, had been $40,000. He utilized an annual growth rate for Ageloff's earnings of 19%, which consisted of an inflation rate of 6.5% and a real growth rate of 3.5%. Dr. Goffman then assumed that Ageloff would save 25% of his gross earnings and reinvest it back into the family business, Kidsworld. Based on his analysis of the company's earnings, Dr. Goffman assumed that these reinvested savings would yield an annual return of 12.5%. Based upon these assumptions, Dr. Goffman testified that the prospective net accumulations of Ageloff's estate, unreduced to present value, were $38,730,300. Utilizing a discount rate of 7%, Dr. Goffman reduced the net accumulations to a present value of $1,974,190.
The Plaintiffs' second expert witness, Dr. Cunitz, performed his calculations in substantially the same manner. Dr. Cunitz estimated Ageloff's annual earnings from Kidsworld at the time of his death at $41,250. He used an annual growth rate for Ageloff's earnings of 11.5%, consisting of an inflation rate of 6.5% and a real growth rate of 5%. Dr. Cunitz then assumed a savings rate beginning at 10% for 1986 and increasing gradually each year thereafter to 25% in the year 2016, after which it would remain constant. Like Dr. Goffman, Dr. Cunitz also predicted that Ageloff would have reinvested the saved portion of his income into Kidsworld. He estimated, however, that the annual return on these reinvested savings would be 18%. From these assumptions, Dr. Cunitz calculated that Ageloff's prospective net accumulations unreduced to present value were $55,540,850. He reduced that figure to present value by use of a 7% discount rate for a result of $2,829,688.
Delta's expert, Dr. Hartley Mellish, an economist, based his calculation of Ageloff's net accumulations on Ageloff's actual remuneration received from Kidsworld during the period from 1981 to 1985, i.e., Ageloff's income shown on his federal income tax return. Dr. Mellish annualized the income figure for the incomplete calendar year of 1985, then accounted for inflation by adjusting all figures to 1986 dollars. Finally, he averaged those adjusted figures to yield an estimated 1986 income of $29,688. He then took into account probable future *1091 increases in income in real terms in order to avoid predicting the future rate of inflation. Dr. Mellish predicted that Ageloff's "net accumulation rate" (rather than savings rate) would have been 25% of his gross income over the remainder of his life expectancy. According to Dr. Mellish, that 25% figure included both a savings rate and an increase in the value of assets in which those savings were placed. Dr. Mellish assumed that the Decedent would not reinvest his savings in Kidsworld, because, according to Dr. Mellish's calculations, such an investment would yield a negative rate of return.
Dr. Mellish then assumed that, for the period between the Decedent's death and his retirement at age 65, the difference between the real growth rate and the real discount factor would average 1%. Dr. Mellish calculated the prospective net accumulations of Ageloff's Estate, reduced to present value, as $305,026. Dr. Mellish predicted that Ageloff's cost-of-living consumption between age 65 and the completion of his life expectancy nine years later, would have diminished the present value of the prospective net accumulations to $279,878 by the time of his death.
The jury returned a verdict in favor of the Plaintiffs for $1,000,000. The Defendant's Motion for New Trial was denied. Thereafter, Delta filed a timely Notice of Appeal in this Court.
Ageloff v. Delta Air Lines, Inc., 867 F.2d 1268, 1269-71 (11th Cir.1989) (footnote omitted).
The court of appeals certified the following questions:
1. Does the definition of Net Accumulations under Fla. Stat. § 768.18(5) of the Florida Wrongful Death Act:
(a) include investment income?
(b) exclude the investment return on future savings of a Decedent as constituting "income from investments continuing beyond death?"
2. Under the Florida Wrongful Death Act, should determination of the future inflationary effects on prospective net accumulations be calculated upon the (i) below-market-discount method, (ii) the case-by-case method, (iii) the total offset method?
Id. at 1271 (footnote omitted).
As worded, the answer to question 1(a) appears to be answered by the explicit language of the Wrongful Death Act. Section 768.18(5) provides:
(5) "Net accumulations" means the part of the decedent's expected net business or salary income, including pension benefits, that the decedent probably would have retained as savings and left as part of his estate if he had lived his normal life expectancy. "Net business or salary income" is the part of the decedent's probable gross income after taxes, excluding income from investments continuing beyond death, that remains after deducting the decedent's personal expenses and support of survivors, excluding contributions in kind.
(Emphasis added.) As we recently explained in Wilcox v. Leverock, 548 So.2d 1116 (Fla. 1989), income from investments in which the decedent had an interest at his death is passive income which continues to accrue regardless of his skill or efforts. The untimely death deprives neither the decedent's estate nor his survivors of the income from these investments. Thus, we answer question 1(a) in the negative.
Whereas we presupposed that question 1(a) involves investments that the decedent made before his death, question 1(b) involves a wholly different proposition: income from investments that the decedent would have made with his anticipated savings, had he lived. Ageloff contends that by excluding income on "investments continuing beyond death," the statute only intended to prevent the recovery of interest on the decedent's actual investments, and not those which could have been made had he not died. Delta argues that by excluding "income from investments continuing beyond death," the legislature meant to exclude income derived from acts of investing which continue beyond death. Delta further contends that if anticipated future investment income is computed in net accumulations, *1092 the survivors not only would receive the money the decedent would have earned by investing savings but would also have the ability to earn interest on those funds.
The logic of excluding from net accumulations the income from investments in which the decedent had an interest at the time of his death is evident. The income will continue to accumulate regardless of the decedent's efforts. Therefore, there has been no loss to the decedent's estate or his survivors. On the assumed facts of this case, however, the absence of the decedent makes a great deal of difference. Because of his death, there are no earnings from which funds can be saved with which to buy investments that would generate additional income. If the decedent had lived and acquired investments from savings on his earnings, the income from these investments would have enhanced the value of his estate had he lived his normal life span. Under these circumstances, the estate and the survivors are deprived of the income on these investments.
In keeping with the legislative admonition that the Wrongful Death Act is remedial and shall be liberally construed, section 768.17, Florida Statutes (1987), we hold that the investment return on future savings of a decedent is not excluded from net accumulations. Delta's argument relies on the faulty premise that the present value of net accumulations should be computed in the same manner as determining an award for impaired earning capacity on an annual basis. However, the recovery of net accumulations does not occur on an annual basis, but only once at the end of the decedent's life expectancy. Net accumulations are more than replacement salary. They are supposed to represent what the decedent's estate would have been worth at death. This sum is reduced to present value so that it can be reinvested by the survivors, with the intention that when the estimated natural death of the decedent occurs the estate will equal what it would have been worth had he not died. If it can be proved that the decedent would have earned income from savings, it is not a double recovery for the survivors to recover this lost income. We answer question 1(b) in the negative.
The second certified question asks how inflation should be taken into account for purposes of determining the present value of net accumulations under the Wrongful Death Act. Courts have long recognized that future inflation can substantially affect the determination of the present value of damage awards. There are three recognized methods for taking into account the effect of inflation. These were described in Culver v. Slater Boat Co., 722 F.2d 114, 118 (5th Cir.1983), cert. denied, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984), as follows:
In the case-by-case method, the fact-finder is asked to predict all of the wage increases a plaintiff would have received during each year that he could have been expected to work, but for his injury, including those attributable to price inflation. This prediction allows the fact-finder to compute the income stream the plaintiff has lost because of his disability. The fact-finder then discounts that income stream to present value, using the estimated after-tax market interest rate, and the resulting figure is awarded to the plaintiff.
In the below-market-discount method, the fact-finder does not attempt to predict the wage increases the particular plaintiff would have received as a result of price inflation. Instead, the trier of fact estimates the wage increases the plaintiff would have received each year as a result of all factors other than inflation. The resulting income stream is discounted by a below-market discount rate. This discount rate represents the estimated market interest rate, adjusted for the effect of any income tax, and then offset by the estimated rate of general future price inflation.
The third method is the "total-offset" method. In this calculation, future wage increases, including the effects of future price inflation, are legally presumed to offset exactly the interest a plaintiff would earn by investing the lump-sum damage award. Therefore, the fact-finder *1093 using this method awards the plaintiff the amount it estimates he would have earned, and neither discounts the award nor adjusts it for inflation.
(Footnotes omitted.) In order to simplify matters and to provide more certainty, the Culver majority determined that federal courts within its jurisdiction should thereafter employ the below-market-discount method. Recognizing, however, that this litigation is a diversity case in which state law controls, the Eleventh Circuit Court of Appeals has now chosen to request this Court's advice concerning Florida law.
The only prior Florida decision bearing on this issue is Seaboard Coast Line Railroad v. Garrison, 336 So.2d 423 (Fla.2d DCA 1976). That decision posed the question of whether expert testimony concerning future inflationary trends was admissible as the basis to determine the estimated value of loss of future support for a decedent's survivor. In holding that the expert's testimony was admissible, the court reasoned that to require the finder of fact to ignore evidence of reasonably predictable inflationary trends was inconsistent with the realities of present-day economics. The court concluded:
We think fairer results may be obtained by following the procedure used in the instant case; i.e., permitting expert testimony not only on future inflation, but also on the interest rate used in computing the present value of the award. With all the evidence before it, the jury will better fulfill its function of awarding a sum which, when invested, will fairly compensate the plaintiff for future losses caused by the defendant's negligence.
Id. at 425 (footnote omitted).
In Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983), the United States Supreme Court discussed at length the several methods by which the effect of future inflation is considered. After pointing out the advantages and shortcomings of each of the methods, the Court stated:
The litigants and the amici in this case urge us to select one of the many rules that have been proposed and establish it for all time as the exclusive method in all federal trials for calculating an award for lost earnings in an inflationary economy. We are not persuaded, however, that such an approach is warranted. Accord, Cookson v. Knowles, [1979] A.C., at 574 (Lord Salmon). For our review of the foregoing cases leads us to draw three conclusions. First, by its very nature the calculation of an award for lost earnings must be a rough approximation. Because the lost stream can never be predicted with complete confidence, any lump sum represents only a "rough and ready" effort to put the plaintiff in the position he would have been in had he not been injured. Second, sustained price inflation can make the award substantially less precise. Inflation's current magnitude and unpredictability create a substantial risk that the damages award will prove to have little relation to the lost wages it purports to replace. Third, the question of lost earnings can arise in many different contexts. In some sectors of the economy, it is far easier to assemble evidence of an individual's most likely career path than in others.
Id. at 546-47, 103 S.Ct. at 2555.
Likewise, we decline to adopt a particular method for taking into account the effect of inflation upon the determination of prospective net accumulations. If economists are unable to agree on the subject, we doubt that this Court has the expertise to select one method over another. However, we leave open the possibility that at some future date this Court may adopt a particular method after receiving the expert advice of appropriate committees and other interested persons. We answer certified question number 2 by stating that at the present time no particular method for determining future inflationary effects on prospective net accumulations is required under Florida's Wrongful Death Act. Though not required to do so, the parties are at liberty to present expert testimony which employs any recognized method.
*1094 Having answered the certified questions, we return the record to the United States Court of Appeals for the Eleventh Circuit.
It is so ordered.
OVERTON, Acting C.J., and McDONALD, SHAW and KOGAN, JJ., concur.
EHRLICH, C.J., and BARKETT, J., did not participate in this case.